AARON RICHARD GOLUB, ESQUIRE, P.C.
Attorneys for Plaintiff
34 East 67th Street, 3rd Floor
New York, New York 10021
ph: 212-838-4811
fx: 212-838-4869
ARG 6056

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 CIV 9464**

------------------------------------------------------------X   Civ. Action No.:

PHOTOGENICS, LLC,

**COMPLAINT**

Plaintiff,

**JURY TRIAL DEMANDED**

-against-

DNA MODEL MANAGEMENT, LLC,

Defendant.

------------------------------------------------------------X

Plaintiff PHOTOGENICS, LLC ("Photogenics"), by its attorneys AARON RICHARD GOLUB, ESQUIRE, P.C., as and for its complaint, alleges as follows:

### THE PARTIES

1. Photogenics is a limited liability company duly organized under the laws of the State of California, with its principal place of business at 8549 Higuera Street, Culver City, CA. Photogenics is in the business of developing, nurturing, managing, representing and otherwise investing in the careers of models.

2. Defendant DNA Model Management, LLC ("Defendant"), is a domestic limited liability company with its principal place of business at 555 West 25th Street, New York, NY, and is engaged in the business of model management and representation.

-1-

## JURISDICTION AND VENUE

3. This is a civil action over which this Court has original jurisdiction under the provisions of 28 U.S.C § 1332(a)(1), the diversity jurisdiction statute.

4. Plaintiff, a duly formed California limited liability company, asserts claims arising from a breach of contract with Defendant, a duly formed New York limited liability company with its principal place business in the state of New York. Complete diversity exists between the parties in this action.

5. The amount in controversy is in excess of the statutory minimum of seventy-five thousand dollars ($75,000.00).

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND

7. On or about June 25, 2004, Lindsay Ellingson ("Lindsay"), an inspiring young model from Moreno Valley, California, contracted (the "Model Management Agreement," or "MMA") in writing with Photogenics to act as her "sole and exclusive" manager. Lindsay agreed that Photogenics would be her sole "advis[or] and counsel" in all matters related to the modeling, advertising and entertainment industries and promised to advise Photogenics of "all offers of employment submitted to [her] anywhere in the world with respect to modeling" and to forward to Photogenics any and all inquiries for her services. Prior thereto Lindsay had little to no experience as a professional model.

8. The MMA established Photogenics as Lindsay's "mother agency."[1]

9. The MMA provided for Lindsay to pay Photogenics twenty percent (20%) of all compensation received "as a result of Agreements (and any renewals or renegotiations thereof...)" entered during the term of the agreement ("Modeling Fee"). On each and every occasion that a client of Photogenics used Lindsay's modeling services, Lindsay acknowledged that such client would pay Photogenics, pursuant to contract, a fee equal to twenty percent (20%) of such client's payment for each modeling job Lindsay performed ("Service Fee"). The initial term of the MMA was two (2) years, beginning June 25, 2004. The MMA automatically renews for successive two year terms, unless Photogenics or Lindsay provide notice of termination by registered mail at least ninety (90) days prior to the end of the term then in effect. The MMA automatically renewed in June 2006, June 2008 and June 2010, and currently remains in full force and effect.

10. The team at Photogenics made great investments in Lindsay, nurturing and developing her into a world-class model. In less than six months after engaging Photogenics, Lindsay made her debut on the spring Paris runways, opening for world-renowned designer Christian Dior, and walking down prestigious runways for YSL, Chanel, Lanvin and Givenchy. Within the first year of engaging Photogenics, Lindsay had appeared: in editorials for top fashion publications, including *The New York Times Magazine*, *Marie Claire* and international editions

---

[1] A "mother agency" is the model management company that first discovers and develops a model, fostering her (hence the term "mother") and guiding her for the duration of her career. As a model's primary manager, the mother agency is exclusively empowered to enter into agreements with other model management companies in markets not serviced by the mother agency.

of *Vogue*; in advertising campaigns for Dior and Moschino, and; across the pages of numerous other storied fashion magazines.

11. Photogenics has duly performed all of its duties under the MMA and adhered strictly to all of its terms and conditions, and continues to do so. As a direct result of Photogenics' performance and discharge of its various and unique managerial duties under the MMA, Lindsay has enjoyed enormous industry-wide success, recognition and exposure and received an extraordinarily strong professional foundation for a financially fruitful and successful modeling career.

12. In or around late 2005, Cyril Brule ("CB"), founder of Viva Model Management, Lindsay's Paris, France, model management company, recommended to Nicole Bourdeaux ("NB"), Photogenics principal and founder, that she introduce Lindsay to Defendant. Upon information and belief, David Bonnouvrier ("DB"), Defendant's principal, had strongly encouraged CB to recommend Defendant to NB, knowing the weight that such a recommendation would carry.

13. On the strength of CB's recommendation, Photogenics, in its capacity as Lindsay's mother agent and sole representative, introduced Defendant to Lindsay.

14. DB and his father, the late Jerome Bonnouvrier ("JB"), also a former principal of Defendant, repeatedly assured NB that it always continued to pay commissions to models' mother agencies, even after the relationship between a model and her mother agency had dissolved. DB and JB provided specific examples of models to whose mother agencies Defendant was still paying commissions, even though the models and mother agencies were no longer associated. DB and JB promised NB, for as long as Lindsay was represented by

Defendant, that Defendant would continue to pay Photogenics commissions, regardless of Photogenics' relationship with Lindsay, and that NB can "100% trust DNA" with the commission.

15. In or around late 2005 to early 2006, Photogenics entered into an agreement with Defendant whereby Photogenics, in its capacity as Lindsay's mother agent and sole and exclusive manager, authorized Defendant to represent Lindsay in the New York modeling market. Pursuant thereto, Defendant paid Photogenics a certain commission on Lindsay's gross earnings for all bookings made by Defendant.

16. On or about January 13, 2008, Photogenics entered into a written agreement, dated January 13, 2008, and captioned the "Commissions Agreement" ("CA"), with Defendant which, inter alia, confirmed that Photogenics is Lindsay's "Mother Agency" and provided that Defendant would represent Lindsay "within the New York modeling market(s)."

17. The CA unambiguously states, consistent with Defendant's promises to NB:

> **As long as the above-mentioned model [Lindsay] is represented by your agency [Defendant], regardless of their status with Photogenics LLC**, we [Photogenics] will receive from your agency, on a bi-annual basis, 10% [ten percent] of his or her gross earnings from on-stay or direct bookings for Print or Runway, and 5% [five percent] of any Film or Television bookings. (emphasis added)

18. In the event that Lindsay should no longer wish to be represented by Defendant or that Defendant no longer chose to represent Lindsay, the CA provided that, prior to termination, "all monies earned by the model and paid by the client, must be paid in full as well as paying the above commission to Photogenics LLC, immediately."

19. By the time Photogenics entered into the CA with Defendant, Lindsay – as a direct result of Photogenics' efforts – had been featured in Italian *Elle*; had appeared in editorials in *Vogue*, *V*, Spanish *Vogue* and British *Harper's Bazaar*; had been photographed by top photographers for prestigious ad campaigns by Dolce & Gabbana and DKNY; and had opened, closed and walked runway shows in New York, London and Paris for the world's top designers.

20. Lindsay's burgeoning career continued to flourish after Photogenics introduced Defendant to her. In 2008, she was made the female face of the Tommy Hilfiger brand and in November 2009, she was selected by Victoria's Secret to be an "Angel," propelling her into the upper echelon of supermodels. Lindsay, not Defendant, was chiefly responsible for her selection as a Victoria's Secret "Angel". Upon information and belief, Lindsay's portfolio or "book", which was compiled by Defendant and used as the basis for her securing new clients, still primarily consists of editorials and magazine covers photographed before Lindsay was even introduced to Defendant.

21. It is typical and customary in the industry for a model, once she reaches certain earnings potential, to renegotiate the commission she pays to her regional management company or companies, here Defendant. Consistent therewith, unless provided otherwise in the agreement with the mother agency, the mother agency's commission on gross earnings remains the same.

22. Photogenics' commission on gross earnings was to remain unchanged for as long as Defendant continued to represent Lindsay, regardless of her status with Photogenics and any renegotiation of her commission with Defendant.

23. Upon information and belief, in or about late 2009, after Lindsay became a Victoria's Secret "Angel," Defendant exerted pressure upon Lindsay to renew her contract with Defendant. At this time, Lindsay sought a commission reduction from Defendant, who then referred Lindsay to Defendant's counsel, purportedly to represent Lindsay in Defendant's negotiations with her. Upon information and belief, neither Defendant nor its counsel advised Lindsay of their flagrant conflict of interest.

24. Such conflicted counsel advised Lindsay, among other advice, that she would be able to obtain only a 2.5% reduction, from 20% to 17.5%, in the commission paid to Defendant, despite the fact that it is customary in the industry for a model earning as much as Lindsay to pay only a 10% commission. Defendant demanded that Lindsay continue to pay Defendant a 20% commission throughout 2010.

25. In or about that time, in a letter dated January 13, 2010 (the "Letter"), from Wayne Spivak, Defendant's Chief Financial Officer, to NB, Defendant abruptly and without any notice whatsoever, informed Photogenics that it was terminating the CA.

26. NB thereafter contacted DB who said he had "deleted" Photogenics' commission because Lindsay wanted to negotiate a commission reduction from Defendant, presumably from 20% to 10%, when in fact, Defendant was still earning a 20% commission from Lindsay and would continue to do so throughout 2010, and even after that time, would still earn a 17.5% commission.

27. Since purportedly terminating the CA, Defendant has continued, without authorization, to represent Lindsay and earn commissions (plus service fees), and has not paid

Photogenics any commissions whatsoever on any monies earned by Lindsay after January 13, 2010, resulting from Defendant's unauthorized representation.

28. Such commissions include, without limitation, commissions on an agreement between Lindsay and Victoria's Secret entered into (upon information and belief) in or around June or July 2011 for earnings of up to $1.5 million annually.

29. At all times relevant to this action, Defendant has been aware of the MMA between Photogenics and Lindsay, as well as Photogenics' considerable investment in and expenditures toward Lindsay's career.

30. Defendant nonetheless encouraged Lindsay to allow Defendant to continue to represent her after it had purportedly terminated its agreement with her mother agency, Photogenics, in breach of the MMA.

31. In fact, to induce Lindsay to breach the MMA, Defendant deliberately withheld and actively concealed from Lindsay – and Lindsay indeed did not discover until late 2011 – that Defendant had purportedly terminated its agreement with Photogenics and stopped paying the Commissions.

32. Had Lindsay known that Defendant had purported to terminate the CA and had ceased paying Photogenics its due commissions, and/or that Defendant's representation of her was entirely without authorization, it is doubtful that Lindsay would have continued in her association with Defendant or allowed Defendant to continue to represent her.

33. On or about October 12, 2011, NB prevailed upon DB to honor the CA. DB again refused to pay the commissions due Photogenics for all bookings since January 13, 2010; revealed that Lindsay was earning between two million and three million dollars annually;

admitted that Defendant had breached the CA, stating that when a model makes over $1.5 million that DB deletes the mother agency and applicable commissions, and; dogmatically asserted that three years was the "cut off" mark for its agreements with mother agencies.

### AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

34. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

35. From the commencement of the CA, Photogenics duly performed all of its duties and obligations under the CA and strictly adhered to its terms and conditions.

36. Defendant failed and refused to perform all of its duties and obligations under the CA, and failed and refused to adhere to its terms and conditions, particularly and especially Defendant's express agreement to pay Photogenics its due commissions for "[a]s long as [Lindsay] is represented by your agency [Defendant], regardless of their status with Photogenics."

37. As a result of the foregoing, plaintiff is entitled to its unpaid commissions in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus legal interest.

### AS AND FOR A SECOND CAUSE OF ACTION
(Tortious Interference with Contract)

38. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

39. In connection with the execution of the MMA, Photogenics obtained valuable property rights with respect thereto and with respect to the Modeling Fee and Service Fee thereunder.

40. As aforestated in paragraph 29, at all times relevant hereto, Defendant knew of the existence of and/or the material terms of the MMA, including Photogenics' exclusive rights under the MMA and the substantial financial and other benefits to be derived therefrom.

41. As aforestated in paragraphs 30-32, Defendant knowingly, intentionally, deliberately, unjustifiably, wrongfully, tortiously, and with the intent to interfere with Photogenics' rights under the MMA, and in order to benefit from said interference, wrongfully induced, enticed, procured, and caused Lindsay to fail to perform and comply with her contractual commitments and obligations under the MMA.

42. Defendant knew that Photogenics had not violated any of the terms of the MMA, and knew that Lindsay had no right to refuse to comply with the terms of the MMA.

43. In connection with the foregoing, Defendant has wrongfully induced Lindsay, notwithstanding her contractual obligations to Photogenics pursuant to the MMA and Photogenics' exclusive rights as set forth in the MMA, to continue her association with Defendant and breach the MMA.

44. As aforestated in paragraph 32, but for Defendant's actions, Lindsay would not have breached the MMA.

45. Defendant, in committing the above-described actions, has tortiously interfered with Photogenics' contractual and property rights under the MMA, and has tortiously

interfered with the economic advantages and prospective business opportunities reasonably to be derived therefrom by Photogenics.

46. As a result of the foregoing, plaintiff is entitled to damages in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus legal interest.

### AS AND FOR A THIRD CAUSE OF ACTION
(Fraudulent Inducement)

47. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

48. During the negotiation of the CA and prior to the CA's execution, Defendant deliberately and intentionally withheld material information from Photogenics, actively concealing the fact that Defendant had no intention of honoring the CA for more than three (3) years, and/or that Defendant had no intention of honoring the CA if Lindsay's gross earnings exceeded $1.5 million dollars. In fact, it is and was Defendant's dishonest and nefarious business practice, at all times relevant to this action, to never honor agreements with mother agencies, and to always "delete" the mother agency after three (3) years and/or once a model's earnings approached $1.5 million dollars. Defendant actively concealed its dishonest and nefarious business practice and its specific intention not to honor the CA while, at the same time, DB and the late JB expressly promised and assured NB that it would continue to pay Photogenics its commissions for as long as Lindsay was represented by Defendant.

49. Defendant knew that its concealments, omissions and misrepresentations, as stated in paragraph 48 above, were material and that, by deliberately concealing such

information and making false promises, any reasonable contracting party in the industry would infer that Defendant intended to honor the CA without regard to term or amount of gross earnings.

50. Lindsay is and was such a promising talent (see paras. 10, 19-20) that Defendant would have said or done anything to induce Photogenics to enter into the CA and authorize Defendant to represent her. Defendant recklessly made promises and assurances to Photogenics—including that it would pay Photogenics commissions for as long as Lindsay was represented by Defendant, without limitation—with a willful and conscious disregard to their falsity and with the intent that Photogenics rely on such promises and thus be induced into entering into the CA.

51. Defendant intended for Photogenics to rely on its false representations and aforesaid concealments, omissions and misrepresentations and the reasonable inferences drawn therefrom, and as a result of such reliance, to be induced into entering into the CA with Defendant, and Photogenics did so rely.

52. If Photogenics had known of Defendant's dishonest and nefarious business practices, and/or that it had no intention of honoring the CA and had every intention of "deleting" the mother agency after three years and/or once Lindsay exceeded $1.5 million in gross earnings, then Photogenics never would have entered into the CA or continued in its association with Defendant.

53. As aforestated in paragraphs 12 and 13, Photogenics' relationship with Defendant originated in a personal recommendation to NB by CB, a close friend and trusted business associate of 15 years. Upon information and belief, and as aforestated in paragraph 12,

DB actively pursued CB and urged him to recommend Defendant to NB with the knowledge that NB would not hesitate to rely upon a recommendation from such a trusted source.

54.     At the time of Photogenics' negotiations with Defendant relating to the CA, NB had known and conducted some business with DB for years, from his time at the Glamour model management company in Paris, France. For the duration of their relationship DB had always acted in a manner that inspired trust and confidence, such that his promises and assurances (see paras. 14, 48), that Lindsay would have a secure career with Defendant, and that Defendant would continue to pay commissions to Photogenics so long as Lindsay was contractually bound to Defendant, were reasonably relied upon by plaintiff.

55.     At the time of the negotiations over the CA, Defendant had known the late JB for many years, a man who was well respected in the industry and had an honorable reputation, which NB reasonably believed and trusted as accurate. JB's promises and assurances (see paras. 14, 48) therefore inspired reliance, and NB had no reason to suspect any concealment by JB or any malfeasance on his part.

56.     CB's personal recommendation to NB, and NB's longstanding relationship with both DB and the late JB, along with Defendant's standing as one of the top model management companies in the world, all cloaked Defendant with an image of absolute trustworthiness in the eyes of NB and Photogenics, and none of Defendant's actions in its negotiation of the CA did anything to tarnish that image or raise any hint of falsity. For all the aforestated reasons, in addition to NB's lack of sophistication relative to Defendant, Photogenics was reasonable and wholly justified in relying upon Defendant's omissions and misrepresentations, and in fact did so rely. Such reliance included the reasonable belief that

Defendant was not actively concealing or withholding any material information and intended to fully honor the CA, without limitation.

57. As a result of its reliance, Photogenics has been severely damaged, such damage including: the loss of substantial Modeling Fees, Service Fees and commissions; and interference with the exercise and use of its exclusive rights under the MMA.

58. Defendant's actions were taken knowingly, intentionally and/or otherwise recklessly with a callous disregard for Photogenics' rights.

59. As a result of the foregoing, plaintiff has been irreparably harmed and is entitled to damages for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus legal interest, and is further entitled to exemplary damages in a sum in excess of One Million Dollars ($1,000,000.00).

## AS AND FOR A FOURTH CAUSE OF ACTION
(Unfair Competition)

60. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

61. In connection with the execution of the MMA, Photogenics obtained valuable property rights with respect, particularly, to the sole and exclusive management of Lindsay's services in the field of modeling, and with respect to the Modeling Fee and Service Fee thereunder.

62. In continuing to represent Lindsay and collect anomalously large commissions and fees off of her services, notwithstanding and with full knowledge of the

exclusive rights conferred to Photogenics by the MMA, Defendant has unfairly appropriated Photogenics' rights and property and interfered with Photogenics' exercise and use thereof.

63. By fraudulently inducing Photogenics to enter into the CA, and/or by purporting to unlawfully terminate the CA without any justification or reason therefor, and/or by its unauthorized representation of Lindsay, and/or by deliberately and deceitfully withholding material information from Lindsay regarding Defendant's breach of the CA and thereby inducing her to breach the MMA, Defendant has acted in bad faith.

64. As a result of the foregoing, plaintiff has been irreparably harmed and is entitled to damages for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus legal interest.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Unjust Enrichment)

65. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

66. As a result of the foregoing, Defendant has been unjustly enriched at plaintiff's expense and plaintiff is entitled to its Commissions and Service Fees and other damages for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus legal interest.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Quantum Meruit)

67. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

68. As a result of the foregoing, plaintiff is entitled, on a quantum meruit basis, to its Commissions for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), plus legal interest.

**WHEREFORE**, plaintiff respectfully requests the Court enter an order as follows:

(a) On the First Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus appropriate interest thereon;

(b) On the Second Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus appropriate interest thereon;

(c) On the Third Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), as well as exemplary damages in an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00), plus appropriate interest thereon;

(d) On the Fourth Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus appropriate interest thereon;

(e) On the Fifth Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus appropriate interest thereon;

   (f) On the Sixth Cause of Action, for an amount to be determined at trial but believed to be in excess of One Million Dollars ($1,000,000.00) plus appropriate interest thereon;

   (g) Granting to the plaintiff such other and further relief as this Court shall deem just and proper, together with the costs and disbursements of this action, and reasonable attorneys' fees.

Dated: New York, New York
   December 21, 2011

Respectfully submitted,

AARON RICHARD GOLUB, ESQUIRE, P.C.

s/ Aaron Richard Golub
By: Aaron Richard Golub
Attorney for Defendant
34 East 67th Street – 3rd Floor
New York, New York 10065
ph: 212-838-4811
fx: 212-838-4869
e-mail: argolub@argolub.com
ARG 6056

## JURY DEMAND

Plaintiff, by its attorneys, AARON RICHARD GOLUB, ESQUIRE, P.C., hereby demands trial by jury of all claims so triable pursuant to FRCP 38.

Dated: New York, New York
December 21, 2011

Respectfully submitted,

AARON RICHARD GOLUB, ESQUIRE, P.C.

s/ Aaron Richard Golub
By: Aaron Richard Golub
Attorney for Defendant
34 East 67th Street – 3rd Floor
New York, New York 10065
ph: 212-838-4811
fx: 212-838-4869
e-mail: argolub@argolub.com
ARG 6056

NEHEMIAH S. GLANC
(NSG 7264)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===========================================

Civ. Action No.:

PHOTOGENICS, LLC,

Plaintiff,

-against-

DNA MODEL MANAGEMENT, LLC,

Defendant.

*Attorneys for Plaintiff*
*Office and Post Office Address, Telephone*
Aaron Richard Golub, Esquire, P.C.
34 East 67th Street - 3rd Floor
New York, New York 10065
212-838-4811

## SUMMONS AND COMPLAINT

To

Attorney(s) for

Dated

Service of copy of the within is hereby admitted

Attorney(s) for
..................................................
..................................................

---

============**NOTICE OF ENTRY**============

PLEASE take notice that the within is a (certified) true copy of a

duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.

Attorney for

*Office and Post Office Address*
Aaron Richard Golub, Esquire, P.C.
34 East 67th Street-3rd Floor
New York, New York 10065

To

Attorney(s) for

============**NOTICE OF SETTLEMENT**============

PLEASE take notice that an order of which the within is a true copy will be presented for settlement to the Hon.
on
at                   M.

Dated,

Yours, etc.

Attorney for

Aaron Richard Golub, Esquire, P.C.
34 East 67th Street – 3rd Floor
New York, New York 10065